

**ARDREDA JOHNSON**
7352 Stonehaven Place
Rancho Cucamonga, CA 91730
Phone: (909) 268-0506
Facsimile: (909) 899-3881
Email: ardreda@aol.com

PLAINTIFF IN PRO PER

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

ARDREDA JOHNSON

      Plaintiff,

v.

PENNYMAC LOAN SERVICES, LLC;
PENNYMAC MORTGAGE
OPPORTUNITY FUND INVESTORS,
LLC; FCI LENDER SERVICES, INC.;
CROSBY CAPITAL USA LLC; CLEAR
RECON CORP. AND DOES 1-10,
INCLUSIVE

      Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

CASE No. 5:17-cv-02506-JGB-SHK (SHKx)

FIRST AMENDED COMPLAINT FOR:

1. VIOLATION OF 15 U.S.C. §1692f(6)
2. VIOLATION OF CALIFORNIA
   HOMEOWNER'S BILL OF RIGHTS
   ("HBOR") CIVIL CODES
   §§2924(a)(6), 2924.17
3. VIOLATION OF CIVIL CODE
   §2934a(a)(1)(A)(C)(D)
4. NEGLIGENT REPRESENTATION
5. CANCELLATION OF
   INSTRUMENTS
6. VIOLATION OF CALIFORNIA
   CIVIL CODE §2923.5
7. VIOLATION OF CALIFORNIA
   BUSINESS & PROFESSIONS
   CODE §17200, ET SEQ.

Pursuant to Federal Rules of Civil Procedure 15(a)(1)(B), Plaintiff ARDREDA

JOHNSON, ("Plaintiff" or "JOHNSON"), a "consumer" pursuant to the Fair Debt

Collection Practices Act, hereinafter referred to as FDCPA, *15 U.S.C. § 1692a(3)*, against

1

FIRST AMENDED COMPLAINT

Defendant PENNYMAC LOAN SERVICES, LLC, hereinafter referred to as PLS in the capacity as Plaintiff's purported former mortgage loan servicer of her debt obligation; Defendant PENNYMAC MORTGAGE OPPORTUNITY FUND INVESTORS, LLC, hereinafter referred to as PENNYMAC, in the capacity of Plaintiff's former assignee or beneficiary of her debt obligation; newly added Defendant FCI LENDER SERVICES, INC., hereinafter referred to as FCI, in the capacity as Plaintiff's purported new mortgage loan servicer of Plaintiff's debt obligation; and newly added Defendant Crosby Capital USA LLC, hereinafter referred to as CCU, in the capacity as Plaintiff's purported new assignee or beneficiary of her debt obligation; and newly added Defendant CLEAR RECON CORP., hereinafter referred to as CRC, in the capacity as the "foreclosing trustee",  all Defendants are "debt collectors" pursuant to the FDCPA, *15 U.S.C. §§1692a(6), 1692f(6)*, complains, pleads and alleges as follows:

## I.    <u>STATEMENT OF JURISDICTION</u>

This Court has original jurisdiction over the claims in this action based on *28 U.S.C. §§1331, 1332, 1343, 15 U.S.C. §§1692f(6), 1692 , et seq.* and *42 U.S.C. §1983* which confer original jurisdiction on federal district courts in suits to address the deprivation of rights secured by federal law.[1]

This Court has original jurisdiction over the claims in the action based on *28*

---

[1] The Ninth Circuit instructs that in actions brought under *28 U.S.C. § 2201*, district courts must first determine whether there is actual controversy within its jurisdiction by analyzing the factors enumerated in *Brillhart v. Excess Ins. Co.*, 316 U.S. 491 (1942).  The *Brillhart* factors require the Court to 1) avoid needless determination of state law issues; 2) discourage litigants from filing declaratory actions as a means of forum shopping; and 3) avoid duplicative litigation.  *Brillhart*, 316 U.S. at 495; *see also Schafer v. Citimortgage* No. CV 11-0319, 2011 WL 2437267 (C.D. Cal. June 15, 2011).  As held by the court in *Schafer*, this action does not involve a needless determination of state law issues, does not involve forum shopping, and is not duplicative litigation.

FIRST AMENDED COMPLAINT

*U.S.C. §1332* which confers original jurisdiction on federal district courts in suits between diverse citizens that involve an amount in controversy in excess of $75,000.00.

This Court also has supplemental jurisdiction over the pendant state law claims because they form a party of the same case or controversy under Article III of the United States Constitution, pursuant to *28 U.S.C. §1367*.

The unlawful conduct, illegal practices, and acts complained of and alleged in this Complaint were all committed in the Central District of California and involved real property located in the Central District of California. Therefore, venue properly lies in this District, pursuant to *28 U.S.C. §1391(b)*.

## II.    SUBJECT REAL PROPERTY AT ISSUE

The Real Property (herein after referred to as "Property"), the subject of any and all claims of any of the Parties hereto, and which is the subject of instant action, and that of which Plaintiff prays for a Decree and/or Order thereto. The "Subject Property" address and legal description is as follows: 7352 Stonehaven Place, Rancho Cucamonga, CA 91730. More particularly, the legal description of this property is:

LOT(S) 17 OF TRACT NO. 14407, IN THE CITY OF RANCHO CUCAMONGA, COUNTY OF SAN BERNARDINO, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 248 PAGE(S) 14 THROUGH 19 INCLUSIVE, FILED IN THE OFFICE OF THE COUNTY RECORDER OF SAN BERNARDINO COUNTY ON MAY 26, 1992.

Assessor's Parcel Number:  0227-831-17-0-000.

FIRST AMENDED COMPLAINT

## III.    IDENTITY OF PARTIES

Plaintiff is informed and believes, and thereon alleges, that at all times relevant hereto Defendant, PENNYMAC LOAN SERVICES, LLC ("PLS"), is a registered California mortgage institution licensed to do business in the State of California, in and of the County and City where subject "PROPERTY" is so situated and physically located which is within this Courts Judicial District.  PLS's principal purpose of business is servicing residential mortgage loans, regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another and attempts to enforce security interests in real properties.  PLS is a debt collector pursuant to the FDCPA.

Plaintiff is informed and believes, and thereon alleges, that at all times relevant hereto Defendant, PENNYMAC MORTGAGE OPPORTUNITY FUND, LLC. ("PENNYMAC"), is an unknown and unregistered business operating in the state of California.  PENNYMAC's principal purpose of business is one who attempts to enforce security interests in real properties.  PENNYMAC is a debt collector pursuant to the FDCPA.

Plaintiff is informed and believes, and thereon alleges, that at all times relevant hereto Defendant, FCI LENDER SERVICES, INC. ("FCI"), is a registered California mortgage institution licensed to do business in the State of California, in and of the County and City where subject "PROPERTY" is so situated and physically located which is within this Courts Judicial District.  PLS's principal purpose of business is servicing

4

FIRST AMENDED COMPLAINT

residential mortgage loans, regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another and attempts to enforce security interests in real properties.  FCI is a debt collector pursuant to the FDCPA.

Plaintiff is informed and believes, and thereon alleges, that at all times relevant hereto Defendant, CROSBY CAPITAL USA LLC. ("CCU"), is an unknown and unregistered business operating in the state of California.  CCU's principal purpose of business is one who attempts to enforce security interests in real properties.  CCU is a debt collector pursuant to the FDCPA.

Plaintiff is informed and believe, and thereon allege, that at all times relevant hereto Defendant, CLEAR RECON CORP. ("CRC"), is a registered California Corporation licensed to do business in the State of California, in and of the County and City where subject "PROPERTY" is so situated and physically located which is within this Courts Judicial District.  CRC's principal purpose of business is enforcing security interests in real properties.  CRC is a debt collector pursuant to the FDCPA.

Plaintiff is unaware of the true names and capacities of any individuals and/or entities sued herein under the fictitious names DOES 1 to 10, inclusive or, to the extent that the names of such individuals or entities may become known to Plaintiff, and as such Plaintiff cannot state with any certainty that such a Cause of Action lies herein as against such individuals or entities, or Plaintiff is unable to allege the elements of such Cause of Action, at this time, and as such said Defendants are herein named in accordance with the provisions of (*Cal Code of Civil Procedure Sec. 474*).  Plaintiff thereon reserves the right

FIRST AMENDED COMPLAINT

to amend instant Complaint to allege the true names and capacities of such fictitiously named Defendants when the same become known or when it has been ascertained with reasonable certainty that such Cause of Action hereunder can be satisfactorily stated and maintained as against each such fictitiously named individual or entity.

Plaintiff is informed and believes and thereon alleges, that in committing certain acts alleged, some or all of the Defendants named were acting as the Agents, Joint Ventures, Partners, Representatives, Subsidiaries, Affiliates, Associates, Successors, Assigns and/or Employees and/or Agents or some or all of the other Defendants, and that some or all of the conduct of such Defendants, as complained of herein, was within the course and scope and agency of such relationship.

Wherever reference is made in this Complaint to any act of any Defendants, that allegation shall mean that each Defendant acted individually and jointly with the other Defendants.

Any allegation about acts of any corporate or other business Defendants means that the corporation or other business did the acts alleged through its officers, directors, employees, agents and/or representatives while they were acting within the actual or ostensible scope of their authority.

At all relevant times, each Defendant committed the acts, caused or directed to others to commit the acts, or permitted others to commit the acts alleged in this Complaint. Additionally, some or all of the Defendants acted as the agent of the other Defendants, and all of the Defendants acted within the scope of their agency if acting as

FIRST AMENDED COMPLAINT

an agent of the other.

At all relevant times, Defendant knew or realized that the other Defendants (successors and/or assigns) were engaging in or planned to engage in the violations of law alleged in this Complaint.  Knowing or realizing that the other Defendants were engaging in or planning to engage in unlawful conduct, each Defendants nevertheless facilitated the commission of those unlawful acts, and thereby aided and abetted the other Defendants in the unlawful conduct.

At all times mentioned in this Complaint, Plaintiff, ARDREDA JOHNSON, is an individual consumer residing in the County of San Bernardino and is the owner of the certain Subject Property.

This is a federal judicial issue and the Consumer is authorized by the Constitution for the United States of America, codified in the FDCPA, to enforce the laws of the United States and to protect and defend those inalienable secured rights within the Constitution for the United States of America.  This is an action to enforce the liability of the Debt Collectors/Defendants for violations of this Consumer's protections under the FDCPA, the Constitution for the United States of America, and other consumer protection laws which were enacted by Congress to protect Consumers from illegal, harassing, deceptive and abusive debt collection activities.

The rules of law governing this Complaint is the FDCPA, *15 U.S.C. §1692f(6)*, the Consumer Financial Protection Bureau (CFPB), the Federal Trade Commission (FTC) and Article III, Section 2 of the United States Constitution.  The language to be used in

FIRST AMENDED COMPLAINT

this matter is the Plaint Writing Act of 2010 – which has been enacted by Congress through Executive Order 13563. It requires federal agencies to use clear communications that the public can easily understand and written in plain language.

Any motions or pleadings, that contain legalese and are not written in plain English for the Consumer to understand, will be intentionally confusing, abusive, profane, obscene and harassing to the Consumer, would be a violation of *15 U.S.C. §1692d(2)*, and will be assessed at an additional $5,000.00 per occurrence and added to this Consumer's verified claim.

Any response, communications or counterclaim to this Consumer's Complaint verified claim, from any Debt Collector/Defendant in the form of pleadings or otherwise, should be verified, under oath and penalty of perjury, as required by law. There will be no exceptions. Any false statements made in any communications by the Defendants in this enforcement action, would be considered perjury. Each occurrence of perjury will be assessed at $25,000.00 and will be added to the Consumers' damages.

Any debt collector or attorney attempting to come into this consumer matter, MUST have prior consent from the Consumer or a court of competent jurisdiction to enter their appearance and MUST have the proper license; and MUST be properly bonded and insured in an amount to cover all of the Consumers' damages in this action.

## IV.    **DATE OF DETERMINATION**

Plaintiff herein request that the date of the Judicial determination sought be that of the date of the filing of the Complaint which is December 18, 2017.

FIRST AMENDED COMPLAINT

## V. <u>STATEMENT OF THE CASE</u>

This action arrives out of the illegal conduct and behavior of debt collectors, Defendants, PLS, PENNYMAC, FCI and CCU, engaging in illegal collection activities pursuant to *15 U.S.C. §1692f(6)*. Defendants, due to the failure of the debt being paid, created and filed various foreclosure documents in an attempt to proceed with a non-judicial foreclosure action to dispossess and disable Plaintiff from her personal, private property that was obtained for personal, family and household use – not for commercial business or trade. Plaintiff alleges Defendants have no lawful or legal right to do so.

Plaintiff, a "consumer", disputes the unverified alleged debt with Defendants and have requested verification and validation of the alleged debt. Thus, Plaintiff contends Defendants do not have a lawful right to contact her, attempt to collect on the alleged debt, and proceed with enforcement of a security interest by attempting to conduct a non-judicial foreclosure action against her Property.

## VI. <u>CALIFORNIA HBOR REFLECTS A LEGISLATIVE INTENT TO PROTECT HOMEOWNERS AGAINST ABUSIVE PRACTICES INCLUDING FOECLOSURES BY THE WRONG PARTY</u>

California Homeowner's Bill of Rights ("HBOR") was California's attempt to address a range of misconduct in the mortgage industry. HBOR imposed numerous protections for the homeowner which included: (1) a restriction on "dual-track" foreclosure, which prohibits mortgage servicers from advancing the foreclosure process when a loan modification is underway *(§ 2923.6)*; (2) a requirement that lending institutions provide a single point of contact for the homeowner *(§ 2923.7)*; (3) a

9

FIRST AMENDED COMPLAINT

requirement that loan servicers have reviewed "competent and reliable evidence" of default prior to initiating foreclosure, i.e., an anti-robosigning protection *(§ 2924.17)*; and (4) a private right of action for plaintiffs seeking to enforce certain protections within the act *(§2924.12)*. These pre-emptive measures are properly alleged in Plaintiff's Complaint.

Consistent with the public policy in favor of preserving homeownership, a plaintiff can properly bring an action based on the allegation that the foreclosing party does not own the debt, i.e., the mortgage or the beneficial interest in the deed of trust. Contrary to Defendants' view, a plaintiff, even one in default, suffers real harm when a party without the right to do so seeks to foreclose on his or her home. Accordingly, a homeowner may bring an action on that basis that the wrong party is seeking to foreclose, whether due to an invalid assignment of debt or for any other reason. This is the issue in the case at bar.

This basic principle – **that only a true debt owner or its agent has lawful authority to foreclose has been long recognized in California law**. *Santens v. Los Angeles Co.* (1949) 91 Cal.App.2d 197, 202 ["the trust deed is a mere incident of the debt and could only be foreclosed by the owner of the note;"]; *Dimrock v. Emerald Properties LLC* (2000) 81 Cal.App.4th 868, 875 [interpreting non-judicial foreclosure statutes to codify existing law prior to 1935, which permits only the recorded trustee to foreclose at a given time]. This flows from the concept that the debt (i.e. promissory note) and the security interest (i.e. a deed of trust) are interconnected instruments that function and move together. (*California Civil Code § 2936* ["t]he assignment of a debt secured by a

FIRST AMENDED COMPLAINT

mortgage carries with it the security"].)

Because the Deed of Trust secures the debt, only the debt owner (or the debt owner's agent) can enforce it.  Thus, a non-debt-owner acts "wrongfully" when it forecloses or attempts to foreclose on a Deed of Trust to which it is not the beneficiary, and a plaintiff can bring a wrongful foreclosure action challenging that conduct. *Barrionuevo, supra*, 998 F. Supp.2d at p. 972 [plaintiff may "properly allege that only the 'true owner' or 'beneficial holder' of a Deed of Trust can bring to completion a non-judicial foreclosure under California law"].)

## VII.    <u>FACTUAL ALLEGATIONS</u>

On November 7, 2006, Plaintiff executed a Deed of Trust in favor of First NLC Financial Services, LLC, hereinafter referred to as First NLC.  First NLC is a "creditor" pursuant to the FDCPA, *15 U.S.C. §1692a(4)*.  The transaction pursuant to the FDCPA, *15 U.S.C. §1692a(5)* is a "debt" and hereinafter referred to as a "debt" or "debt obligation".  Attached as **Exhibit "A"** and incorporated herein by reference is a true and correct copy of the Deed of Trust, hereinafter referred to as DOT.  Attached as **Exhibit "B"** and incorporated herein by reference is a true and correct copy of the Adjustable Rate Note, hereinafter referred to as Note.  The copy of the Note was provided by Defendant PLS and has no endorsements that evidences Defendant PENNYMAC is the current owner or beneficiary of the debt obligation.  The DOT and Note have a loan number that is different from what Defendants have and reference to the debt obligation.

Sometime after the closing of the loan, Plaintiff alleges that the debt was

FIRST AMENDED COMPLAINT

purportedly assigned, transferred, and/or sold to the CitiGroup Mortgage Loan Trust 2006-AR9, hereinafter referred to as CitiGroup 2006-AR9 Trust in which U.S. Bank National Association is the Trustee. Based on information and belief, this transaction had to occur on or before November 30, 2006, the Trust's Closing Date. Based on information and belief, the alleged debt has been paid off. Attached as **Exhibit "C"** and incorporated herein by reference are Bloomberg Screenshots of the alleged debt along with a notarized Affidavit of Facts from a certified Bloomberg Specialist.

In 2011, Plaintiff experienced a financial hardship that caused her to fall behind in her payments. Her financial hardship grew deeper and she was unable to get caught up with her payments and the debt subsequently fell into default. To date the debt obligation is contractually due for the February 1, 2011 payment.

On May 23, 2011, an Assignment of Deed of Trust, hereinafter referred to as ADOT, was executed and subsequently recorded on Plaintiff's Property on June 8, 2011. For consideration of Ten ($10) dollars, the debt obligation was purportedly granted, bargained, sold, assigned, and set over to CitiMortgage, Inc., hereinafter referred to as CitiMortgage. CitiMortgage was purportedly Plaintiff's former servicer before the debt obligation was transferred to Defendant PLS. At the time of this purported transfer, the debt was contractually due for the February 2011 payment. Plaintiff adamantly disputes the contents of this instrument. Attached as **Exhibit "D"** and incorporated herein by reference is a true and correct copy of the 2011 ADOT.

On June 15, 2011, a Notice of Default, hereinafter referred to as NOD, was

FIRST AMENDED COMPLAINT

executed and subsequently recorded on Plaintiff's Property on June 16, 2011. The NOD falsely represents that CitiMortgage was Plaintiff's beneficiary who had the legal authority and right to proceed to enforce the power of sale contained in Plaintiff's Deed of Trust. Shortly thereafter, CitiMortgage recorded a Notice of Trustee's Sale, hereinafter referred to as NOTS, against Plaintiff's Property on October 13, 2011. The scheduled foreclosure sale was canceled and did not occur.

On or about September 8, 2011, Plaintiff received from Defendant PLS a letter entitled "Notification of Assignment, Sale or Transfer of Your Mortgage Loan." In this letter, Defendant PLS stated that the debt obligation was sold to Defendant PENNYMAC on August 25, 2011, however the recorded ADOT, was not executed until February 6, 2012. The letter also states that Defendant PLS was the new servicer of the loan. Attached as **Exhibit "E"** and incorporated herein by reference is a true and correct copy of the August 25, 2011 Notice of Assignment letter. At the time of this purported sale, the debt obligation was due for the February 1, 2011 payment.

On or about September 30, 2011, Plaintiff received a letter from Defendant PLS informing her that her "delinquent home loan is now managed by "PennyMac". The letter served as an official notification that the transfer of the servicing of her loan was being transferred to Defendant PLS effective September 26, 2011. This is in contradiction of the previous letter PENNYMAC sent to Plaintiff on or about September 8, 2011 which stated that PLS was already the servicer. At the time of this acquisition, the debt obligation was contractually due for the February 1, 2011 payment. Pursuant to

13

FIRST AMENDED COMPLAINT

the FDCPA, *15 U.S.C. §1692a(6),* Defendants PLS and PENNYMAC were debt collectors and not creditors with authorization or a right to enforce the security interest. Attached as **Exhibit "F"** and incorporated herein by reference is a true and correct copy of a letter sent to Plaintiff by Defendant PLS dated September 30, 2011.

On February 6, 2012, CitiMortgage purportedly granted, assigned and transferred all beneficial interest and rights under the DOT to Defendant PENNYMAC. Plaintiff alleges this purported transfer occurred when the debt was contractually due for the February 1, 2011 payment. Pursuant to *15 U.S.C. §1692a(6),* PENNYMAC is a debt collector. CitiMortgage, as a debt collector themselves, could not transfer what they did not own. Furthermore, this purported transfer is null and void because it violates the requirements of California *Civil Code §1095. Civil Code §1095* states: "When an attorney-in-fact executes an instrument transferring an estate in real property, they must subscribe the name of his principal to it, and his own name as attorney in fact" and attach a copy of the Power of Attorney, hereinafter referred to as POA. The instrument executed in this instrument does not meet this requirement. The ADOT was executed without subscribing the principal's name and therefore invalidates the transaction. The transfer is void. Plaintiff adamantly disputes the contents of this ADOT. Attached as **Exhibit "G"** and incorporated herein by reference is a true and correct copy of the February 2012 ADOT.

On March 15, 2012, CitiMortgage purportedly assigned and set over, without recourse all beneficial interest and rights under the DOT to Defendant PENNYMAC

14

FIRST AMENDED COMPLAINT

CORP. Plaintiff alleges this purported transfer occurred when the debt was contractually due for the February 1, 2011 payment. Pursuant to *15 U.S.C. §1692a(6)*, PENNYMAC CORP was a debt collector. CitiMortgage, as a debt collector themselves, could not transfer what they did not own. The ADOT is null and void. Attached as **Exhibit "H"** and incorporated herein by reference is a true and correct copy of the April 2012 ADOT.

On July 23, 2013, a Substitution of Trustee, hereinafter referred to as SOT, was executed and subsequently recorded against Plaintiff's Property on April 15, 2014 attempting to substitute the original trustee to Clear Recon Corp, hereinafter referred to as CRC.

Plaintiff alleges this SOT is invalid pursuant to California *Civil Code §2934a(a) (1)(A)(C)(D)*. Pursuant to *Civil Code §2934a(a)(1)(A)(C)(D)* only the beneficiary of the NOTE can substitute a foreclosing trustee under a DOT. Plaintiff alleges the SOT was not executed by the owner of the Note at the time it was executed but was executed by Defendant PLS who is a debt collector and purportedly represented a debt collector and not a creditor. There is no valid recorded document that evidences the SOT was executed by Plaintiff's beneficiary or creditor or an agent of the true creditor.

In addition, the SOT is null and void because it violates the requirements of California *Civil Code §1095*. *Civil Code §1095* states: "When an attorney-in- fact executes an instrument transferring an estate in real property, they must subscribe the name of his principal to it, and his own name "as attorney in fact.", not "its attorney in fact" and attach the POA to the document. This was not done, thus the transfer is void.

15

FIRST AMENDED COMPLAINT

Plaintiff adamantly disputes the contents of this SOT. Attached as **Exhibit "I"** and incorporated herein by reference is a true and correct copy of the SOT.

On April 15, 2014, Defendants PLS and PENNYMAC caused a NOD to be recorded against Plaintiff's Property. The statements contained in the NOD are in violation of the FDCPA because it falsely represents that Defendant PENNYMAC was the beneficiary of the alleged debt when they were not, they are debt collectors. The NOD also falsely represents the character, amount and legal status of the debt obligation. Defendants, and its agents, attempted to enforce a security interest and take a non-judicial action that is prohibited for them to take, *15 U.S.C. §1692f(6)*. Only a creditor can initiate and complete a foreclosure proceeding. Attached as **Exhibit "J"** and incorporated herein by reference is a true and correct copy of the 2014 NOD.

On July 28, 2014, Defendants PLS and PENNYMAC caused to be recorded on Plaintiff's Property a NOTS. The scheduled foreclosure sale did not occur. On January 2, 2015, Defendants PLS and PENNYMAC caused another NOTS to be recorded against Plaintiff's Property. The scheduled sale date did not occur.

On March 2, 2015, Plaintiff obtained a Quiet Title Judgment against PENNYMAC CORP. The judgment awarded Plaintiff an order eliminating the DOT from her chain of title. Attached as **Exhibit "K"** and incorporated herein by reference is a true and correct copy of the Quiet Title Judgment.

On March 16, 2015, Defendants PLS and PENNYMAC caused yet another NOTS to be recorded against Plaintiff's Property. The scheduled sale did not take place because

FIRST AMENDED COMPLAINT

Plaintiff had obtained a Quiet Title Judgment.

On October 27, 2017, the Quiet Title Judgment was ordered vacated. Plaintiff filed an Appeal on December 19, 2017 and the matter is presently pending in the Second District Court of Appeals, Appellate Case Number B287054.

On December 27, 2017, Defendants PLS and PENNYMAC recorded yet another NOTS against Plaintiff's Property. The NOTS is in violation of *15 U.S.C. §1692f(6)* because Defendants are attempting to enforce the power of sale contained in Plaintiff's DOT and are taking or threatening to take a non-judicial action to effect dispossession or disablement of property without the legal right or authority to do so. Pursuant to California *Commercial Code §3118*, the debt is time-barred by operation of law and Defendants are violating *15 U.S.C. §1692e* by attempting to collect and enforce a debt that is statutorily barred by operation of law. Attached as **Exhibit "L"** and incorporated herein by reference is a true and correct copy of the NOTS. The scheduled sale for January 23, 2018 did not occur. The sale is presently scheduled for March 13, 2018.

*15 U.S.C. §1692j(a)* states the following:

> It is unlawful to design, compile, and furnish any form knowing that such form would be used to create the false belief in a consumer that a person other than the creditor of such consumer is participating in the collection of or in an attempt to collect a debt such consumer allegedly owes such creditor, when in fact such person is not so participating.

On or about January 23, 2018, Plaintiff received a letter from Defendant FCI informing her that the servicing of her Promissory Note was being transferred to them effective January 22, 2018. Plaintiff alleges that at the time of this purported transfer, her

17

FIRST AMENDED COMPLAINT

debt obligation was contractually due for the February 1, 2011 payment.  Attached as **Exhibit "M"** and incorporated herein by reference is a true and correct copy of the Notice of Servicing Transfer letter.

On the same date January 23, 2018, Defendant FCI informed Plaintiff in a Welcome Letter that the Lender/Creditor is Defendant CCU.  Plaintiff alleges the letter falsely represents that Defendants FCI and CCU have the legal authority and right to attempt to collect a debt and proceed with a non-judicial action against her Property.  Defendants are debt collectors pursuant to *15 U.S.C. §§1692a(6), 1692f(6)*.  Attached as **Exhibit "N"** and incorporated herein by reference is a true and correct copy of the Welcome Letter.

On January 18, 2018, Defendants PENNYMAC and PLS executed an ADOT purportedly "For Value Received" assigning and transferring all beneficial rights to Defendant CCU.  Plaintiff alleges that at the time of this purported acquisition, the debt was purportedly contractually due for the February 1, 2011.  Pursuant to *15 U.S.C. §§1692a(6)*, Defendants are debt collectors and not creditors.  Plaintiff alleges the ADOT violates the mandatory requirements of California Civil Code *§1095* as previously mentioned.  Furthermore, the POA is not attached to the instrument as required.  The ADOT is null and void and no transfer has been made.  Plaintiff adamantly disputes the contents of this instrument.  Attached as **Exhibit "O"** and incorporated herein by reference is a true and correct copy of the 2018 NOD.

//

FIRST AMENDED COMPLAINT

## VIII.    PLAINTIFF HAS A PRIVATE RIGHT TO ACTION

As a "consumer" with protections under the FDCPA and the Consumer Financial Protections Bureau, hereinafter referred to as CFPB, Congress has afforded the Plaintiffs a "private right of action" for damages caused by the illegal, deceptive and abusive collection activities of a debt collector.  **A "consumer" has the private right to exercise every provision in the consumer protection laws or any other constitutional protections that have been afforded to him as a "consumer".**

The CFPB affirms that Congress intended the FDCPA to be primarily self-enforcing, and the "consumer" does not have to ask permission to enforce it.  The CFPB's Supplemental Amicus Brief for *Bock v. Pressler, LLP*, No. 15-1056 stated the following:

> "The Bureau has a substantial interest in plaintiffs' standing under Article III to bring in federal court to assert their rights under the Fair Debt Collection Practices Act (FDCPA or Act).  Although the Bureau and various other federal Agencies have authority to enforce the Act, *15 U.S.C. § 1692l*, **Congress intended the Act to be "primarily self-enforcing," in that "consumers who have been subjected to collection abuses will be enforcing compliance," S. Rep. No. 95-382, at 5 (1977). An unduly narrow understanding of Article III standing would limit consumers' ability to exercise the Act's private right of action and thereby weaken an important supplement to the Bureau's own enforcement efforts.** *Emphasis added.*

If Defendants feel they have a lawful, bona fide, or verified claim to Plaintiff's personal, private Property, then they MUST file a verified counterclaim pursuant to *15 U.S.C. §1692i.*

//

19

FIRST AMENDED COMPLAINT

## FIRST CAUSE OF ACTION – VIOLATION OF 15 U.S.C. §1692f(6)
[Against All Defendants and Doe Defendants]

1. Plaintiff hereby incorporates by reference each and every one of the preceding paragraphs as if the same were fully set forth herein.

2. Under the FDCPA, the **entire** FDCPA can apply to a party to whose principal business is enforcing security interests but who nevertheless fits *§1692a(6)'s* general definition of a debt collector.

3. Defendants PLS and FCI herein qualifies as "debt collectors" under *15 U.S.C. §§1692a(6), 1692f(6)*.

4. Defendant PENNNYMAC and CCU herein qualifies as "debt collectors" under *15 U.S.C. §§1692a(6), 1692f(6)*.

5. Defendant CRC herein qualifies as a "debt collector" under *15 U.S.C. §1692f(6)*.

6. Plaintiff herein qualifies as a "consumer" under *15 U.S.C. §1692a(3)*.

7. The debt herein incurred qualifies as a debt incurred primarily for personal or household purposes under *15 U.S.C. §1692a(5)*.

8. Defendants' conduct, described in the incorporated paragraphs, violates the FDCPA because the conduct qualifies as: abusive and oppressive conduct; false and misleading representations to collect a debt and enforce a security interest. This conduct includes, but is not limited, to the following below:

9. Defendants are violating *15 U.S.C. §1692f(6)* by perpetrating as creditors and/or agents of creditors and are threatening to proceed, with a non-judicial foreclosure action

20

FIRST AMENDED COMPLAINT

on Plaintiff's Property when they have no present right to possession of the Property claimed as collateral through an enforceable security interest and there is no present intention to take possession of the property.

10. *15 U.S.C. §1692f(6)* regulates more than just the collection of a money debt, it prohibits a non-judicial action to dispossess Plaintiff from her home without a legal ability to do so. Plaintiff alleges Defendants are debt collectors within the meaning of the FDCPA and are attempting to enforce the power of sale contained in the DOT by using unfair or unconscionable means to collect and enforce a security interest in her home.

11. In California only a "creditor" may enforce a foreclosure. Defendants, as debt collectors, and their unauthorized agents are attempting to proceed with a non-judicial foreclosure on March 13, 2018.

12. As alleged herein, Plaintiff's debt was not legally transferred, conveyed, or assigned to Defendant PENNYMAC and then to Defendant CCU before the debt fell into default. Both purported transfers occurred after the debt fell into default on February 1, 2011. Any beneficial interest claimed by Defendants PENNYMAC and CCU was acquired after Plaintiff's debt was in default and they treated the loan as if it was in default.

13. On or around December 27, 2018, Plaintiff found posted on the front door of her Property a NOTS for all to see causing Plaintiff embarrassment and humiliation in front of her neighbors. This is in violation of *15 U.S.C. §1692d(1)* and *15 U.S.C. §1692f(6)*.

21

FIRST AMENDED COMPLAINT

14. Defendants and their unauthorized agents initiated an illegal debt collection action dubbed a foreclosure when they have no legal authority to do so violating *15 U.S.C. §1692e(5), 15 U.S.C. §1692f(6)(A), (B), and (C)*, and *15 U.S.C. §1692i*.

15. Every communication taken by Defendants, including the NOD, SOT, and NOTS are an attempt to collect a debt and enforce a power of sale contained in the DOT and are violations of the FDCPA pursuant to *15 U.S.C. §1692e(5), 15 U.S.C. §1692e(6)(B), 15 U.S.C. §1692i, 15 U.S.C. §1692j(a)* and *(b)*.

16. Defendants have falsely represented the character of the debt and are misrepresenting that they are creditors or agents of creditors and not debt collectors. The foreclosure documents were created and publicly recorded in violation of *15 U.S.C. §1692j(a)(b)* and was compiled and designed in order to collect payment from an illegal sale of the Plaintiff's personal private Property.

17. Defendants have attempted to collect an alleged debt under false, deceptive, and misleading means and stated an inaccurate character, amount and status of said debt violating the FDCPA, *15 U.S.C. §1692e(2)*.

18. Defendants' behavior and conduct have injured and harmed Plaintiff with their willful and continuous illegal, deceptive and criminal violations of federal and state law in their enforcement of the power of sale contained in the DOT.

19. Defendants have violated the FDCPA by attempting to collect an alleged debt and enforcing a security interest on behalf of another, and they are using instrumentalities of interstate commerce, and the mail (U.S.P.S.) to communicate with Plaintiff.

22

FIRST AMENDED COMPLAINT

20. Plaintiff could not have reasonably known of the existence of a claim for a violation of *15 U.S.C. §1692e* because Defendants are fraudulently concealing the fact that they are not entitled to enforce the debt.[2] As a result of Defendants' violations of the FDCPA, Plaintiff is entitled to actual damages pursuant to *15 U.S.C. §1692k(a)(1)*; statutory damages in an amount up to $1,000.00 pursuant to *15 U.S.C. §1692k(a)(2)(A)*; reasonable attorneys' fees, and costs pursuant to *15 U.S.C. §1692(a)(3)*; and declaratory relief, from each and every Defendant herein.

## SECOND CAUSE OF ACTION – VIOLATION OF CALIFORNIA HOMEOWNER'S BILL OF RIGHTS ("HBOR"), CIVIL CODES §§2924(a)(6), 2924.17
[Against All Defendants and Doe Defendants]

21. Plaintiff hereby incorporates by reference each and every one of the preceding paragraphs as if the same were fully set forth herein.

22. The California HBOR consists of a series of related bills including two identical bills that were passed on July 2, 2012 by the state Senate and Assembly. Both of these bills ultimately give rights back to borrowers and create a system in which banks must be held accountable for pursuing their own interests above the borrowers.

23. Defendants are in violation of California HBOR (AB 278/SB 900). The law prohibits recording "robodocs" on ALL mortgage-related notices of default and support

---

[2] "If a reasonable plaintiff would not have known the existence of a possible claim within the limitations period, then equitable tolling will serve to extend the statute of limitations for filing suit until the plaintiff can gather information he needs." *Garcia v. Wachovia Mortg. Corp.*, 676 F.Supp.2d 895, 905 (2009) citing Santa Maria, 202 F.3d at 1178; *see also Stoll v. Runyon*, 165 F.3d 1238, 1242 (9th Cir. 1999) ("Equitable tolling applies when Plaintiff is prevented from asserting a claim by wrongful conduct on the part of the defendant, or when extraordinary circumstances beyond the Plaintiff's control made it impossible to file a claim on time.") (citation omitted.)

FIRST AMENDED COMPLAINT

declarations, notices of sale, assignments of deed of trust, and substitutions of trustee recorded in connection with a non-judicial foreclosure, as well as declarations filed in court with respect to any foreclosure proceeding. Documents must be accurate, complete and supported by competent and relevant evidence. Defendants have violated the notice by not complying with *Civil Code §2924.17*. Defendants have failed to provide competent and relevant support to their authorization to proceed with a non-judicial action against Plaintiff's Property as debt collectors.

24. The law under California HBOR forbids an entity from initiating and/or proceeding with a non-judicial foreclosure **unless** it is the holder of the beneficial interest under the deed of trust, the original or properly substituted trustee under the deed of trust, or designated agent of the holder under the deed of trust, *California Civil Code § 2924(a)(6)*. Plaintiff contend that Defendants are not creditors with the power to enforce the power of sale contained in a DOT, but are debt collectors as defined by the FDCPA, *15 U.S.C. §1692f(6)(F)(iii)*.

25. Defendants have failed to provide an adequate chain of title that would demonstrate their authority to proceed with a non-judicial foreclosure despite Plaintiff's request to provide such documentation and their failure to provide competent and relevant evidence to support the accuracy of their recorded documents. Copies of loan documents are insufficient.

26. The law further affords a right to cure violations up to a foreclosure sale but Defendants have failed to correct any "Material Violations". Pursuant to the law, a

24

FIRST AMENDED COMPLAINT

mortgage servicer, mortgagee, trustee, beneficiary, or authorized agent can avoid liability for any violation that it has corrected and remedied directly or through a third-party contractor prior to recordation of a trustee's deed upon sale.

27. The law affords a private right of action for Borrowers to seek a court injunction for a material violation of provisions up until a foreclosure sale is completed and may seek attorney's fees. The law under California HBOR forbids an entity from initiating and/or proceeding with a non-judicial foreclosure unless it is the holder of the beneficial interest under the deed of trust, the original or properly substituted trustee under the deed of trust, or designated agent of the holder under the deed of trust, *California Civil Code § 2924(a)(6)*.

## THIRD CAUSE OF ACTION – VIOLATION OF CALIFORNIA CIVIL CODE §§2934a(a)(1)(A)(C)
[Against All Defendants and Doe Defendants]

28. Plaintiff hereby incorporates by reference each and every one of the preceding paragraphs as if the same were fully set forth herein.

29. Pursuant to this statute, only the beneficiary of the note can substitute a trustee under a DOT. *Civil Code §2934a(a)(1)(A)(C)(D)* states: The substitution must be signed pursuant to subparagraph (B) of paragraph (1) and the undersigned together hold more than 50 percent of the record beneficial interest of notes secured by the same real property or of undivided interests in a note secured by real property equivalent to a series transaction. Plaintiff alleges the SOT was not executed by an entity that holds more than 50 percent interest but by debt collectors who are not beneficiaries of the Note of the

FIRST AMENDED COMPLAINT

DOT.

30. Plaintiff alleges the SOT is null and void pursuant to California *Civil Code §1095*. *Civil Code §1095* states: "When an attorney-in-fact executes an instrument transferring an estate in real property, they must subscribe the name of his principal to it, and his own name "**as attorney in fact**" not "its attorney in fact" and attach the POA to the document. This was not done. Plaintiff alleges a party relying upon a POA or other document must produce the authenticated original of that document. Using the words "as attorney in fact" means nothing unless the party is able to produce a witness who, in their own personal knowledge, knows and states that the POA is in writing and has not been revoked. That witness must be able to lay the factual foundation and authentication for introduction of the POA or any other such document. A POA must be in writing, duly signed and acknowledged as set forth in state statutes. Oral POAs cannot be used to circumvent the requirements that interests in real property (including mortgages) must be in writing, thus the SOT is null and void and the foreclosure sale is void.

31. In addition subdivision (D) states that Notice of the SOT must be sent by certified mail, postage prepaid, with return receipt requested to each holder of an interest in the obligation secured by the DOT who has not joined in the execution of the SOT or the separate document. Plaintiff alleges Defendant have violated this statute with their failure to comply with subsection (D). Thus, the SOT is null and void and invalid.

32. Herein, there is no factual evidence to demonstrate that the Note was transferred to Defendants PENNYMAC or CCU before February 1, 2011, the date the

26

FIRST AMENDED COMPLAINT

dcbt fcll into default. Thus, pursuant to the definition of *15 U.S.C. §1692a(6)*, neither Defendants PENNYMAC or CCU could have legally been the beneficiary or the holder of the Note at the time the SOT was executed. They were/are a debt collectors.

33. Failure to execute and/or record a ***valid*** SOT is a substantial defect and impacts a right afforded to borrowers to know who the trustee is that will sell their property at a foreclosure sale. As such, a foreclosure sale is VOID and not merely VOIDABLE, and no tender is required to seek to file a lawsuit to set aside the sale. Thus, if Defendants proceed with the foreclosure currently set for March 13, 2018 it would be VOID and must be set aside.

## FOURTH CAUSE OF ACTION – NEGLIGENT REPRESENTATION
### [Against All Defendants and Doe Defendants]

34. Plaintiff hereby incorporates by reference each and every one of the preceding paragraphs as if the same were fully set forth herein.

35. Defendants' conduct, as alleged above and beneath, constitutes an intentional misrepresentation. California *Civil Code §1710(2)*, sets forth the cause of action for a negligent misrepresentation. The elements for a cause of action for a negligent misrepresentation are (1) defendant makes a representation as to a past or existing material fact, (2) defendant made the misrepresentation without any reasonable grounds for believing it to be true, (3) the representation was made with the intent to induce the plaintiff to rely upon it, (4) plaintiff was unaware of the falsity of the representation and acted in justifiable reliance on the representation, and (5) damages.

36. Plaintiff alleges Defendants purposely provided Plaintiff with false information

FIRST AMENDED COMPLAINT

in order to induce her to pay payments to them in which they have no authority or right to collect and to proceed with a non-judicial action against Plaintiff's Property.

37. Furthermore, Plaintiff alleges that Defendants are falsely misrepresenting the true creditor of the alleged debt.

38. Plaintiff further seeks restitution, disgorgement of sums wrongfully obtained, costs of suit, reasonable attorneys' fees, and such other and further relief as the Court may deem just and proper.

## FIFTH CAUSE OF ACTION – CANCELLATION OF INSTRUMENTS
### [Against All Defendants and Doe Defendants]

39. Plaintiff hereby incorporates by reference each and every one of the preceding paragraphs as if the same were fully set forth herein.

40. Plaintiffs have a reasonable apprehension that the wrongful, illegal, and false instruments created, published, and recorded by Defendants herein, if left outstanding, may continue to cause serious injury to Plaintiffs. Plaintiffs requests this court to adjudge and order Defendants to deliver up the DOT, SOT, NOD and NOTS so that they may be canceled, or in the alternative, to declare the them void and to be without force and effect.

41. Plaintiff is further informed and believes and thereon alleges that under *California Code of Civil Procedure §3413*, for an instrument to be subject to a cause of action for cancellation, the instrument must appear to be valid. The foreclosure documents appear on their face to be valid.

42. Plaintiff alleges that Defendants do not have recorded or unrecorded documents showing any legal effective assignment to the DOT and therefore have no standing to

FIRST AMENDED COMPLAINT

commence and complete a foreclosure action scheduled against Plaintiff's Property on March 13, 2018. In other words, Defendants, as debt collectors, have no enforceable rights against Plaintiff's Property.

43. As demonstrated in this FAC, the foreclosure documents executed by Defendants are fraudulent and violate California's non-judicial statute, penal law and federal laws and ought to be cancelled.

## SIXTH CAUSE OF ACTION – VIOLATION OF CIVIL CODE §2923.5
[Against Defendants FCI and CCU and Doe Defendants]

44. Plaintiff hereby incorporates by reference each and every one of the preceding paragraphs as if the same were fully set forth herein.

45. Plaintiff alleges that at all times mentioned herein the Subject Property is her owner-occupied residence. Pursuant to *California Civil Code § 2923.5(a)* under California HBOR, the burden of compliance is placed on the mortgage servicer. Defendant FCI, who just acquired the loan servicing effective February 23, 2018, has failed to properly interact with Plaintiff in exploring Plaintiff's options under **"Foreclosure Prevention Alternative"**. The law defines **"Foreclosure Prevention Alternative"** as any available loss mitigation option. Instead FCI is attempting to proceed with a non-judicial foreclosure in violation of *15 U.S.C. §1692f(6)* despite the fact that they have informed Plaintiff that there is a new creditor.

46. Pursuant to the DOT, in the event of a default, the "creditor" may invoke the power of sale and any other remedies permitted by applicable law. Plaintiff alleges that FCI is not acting on behalf of the true creditor and they themselves are a "debt collector"

29

FIRST AMENDED COMPLAINT

with no authority to attempt to collect or proceed with a non-judicial foreclosure action.

47. *Civil Code §2923.5* applies to "first lien mortgages or deeds of trusts that are secured by owner-occupied residential real property containing more than four dwelling units." For these purposes, Plaintiff has satisfied this requirement.

48. *Civil Code §2923.5(a)(2)* requires a mortgagee, beneficiary or authorized agent to contact a borrower in person or by telephone to assess the borrower's financial status and explore options for the borrower to avoid foreclosure at least 30 days prior to filing a NOD. An NOD that is filed without complying with *Civil Code §2923.5* is null and void. The NOD that was filed in 2014, prior to Defendant CCU's alleged ownership and acquisition, is null and void.

49. Plaintiff alleges that Defendant FCI failed to contact her either in person or by telephone to assess her financial status and fully explore alternatives for her to avoid foreclosure, such as modification, deed-in-lieu and short sale, at least 30 days prior to recording a NOD or proceeding with a non-judicial action. The NOD recorded in 2014 was recorded without the requirements of *Civil Code §2923.5(a)(2)* being met, thereby making the NOD void. Further, the NOD is void due to the fact that it was created and executed by debt collectors and not Plaintiff's creditor.

50. Plaintiff alleges that the declaration attached to the NOD is false and fraudulent in that it states that "[t]he mortgagee, beneficiary or authorized agent for the mortgagee or beneficiary pursuant to California *Civil Code §2923.5(b)* declares that the mortgagee, beneficiary or the mortgagee's beneficiary's authorized agent has either contacted the

FIRST AMENDED COMPLAINT

doing certain acts and practices, such as attempting to collect a debt and enforce a security interest in which they have no right or authority, which are likely to deceive, constituting a fraudulent business act or practice.

59. Specifically, Defendants are engaging in deceptive business practices with respect to mortgage loan servicing, assignments of notes and deeds of trust, the process of initiating related matters by:

a) Assessing improper or excessive fees;

b) Improperly characterizing customers' accounts as being in default or delinquent status to generate unwarranted fees:

c) Instituting improper or premature foreclosure proceedings to generate unwarranted fees;

d) Failing to provide adequate statement information to customers regarding the status of their accounts, payments owed, and/or basis for fees assessed;

e) Seeking to collect and collecting various improper fees, costs and charges that are either not legally due under the mortgage contract or California law, or that are in excess of amounts legally due;

f) Mishandling borrowers' documents resulting in fraudulent defaults and foreclosures;

g) Treating borrower as in default on their loans even though the borrowers are under no obligation to make payments to Defendants, or have otherwise complied with mortgage requirements or California law.

33

FIRST AMENDED COMPLAINT

h) Failing to disclose the fees, costs and charges allowable under the contract;

i) Ignoring Borrowers' Qualified Written Request and Borrowers' demand to produce the original Promissory Note or comply with Borrowers' request for an accounting of all proceeds/payments involved with Borrowers' loan;

j) Executing, manufacturing, creating and recording false, fraudulent, forged and misleading deeds, assignments, notice of sale/default documents; and

k) Acting as beneficiaries and trustees without the legal authority to do so.

l) Failing to disclose the principal for which documents were being executed and recorded in violation of *Cal. Civ. Code section 1095*;

60. Defendants PLS, PENNYMAC, FCI, CCU and CRC have all failed to act in good faith as they took and charged fees for services but did not render them competently in compliance with applicable law.

61. Moreover, Defendants are engaging in a uniform pattern and practice of unfair and over-aggressive servicing that resulted in the assessment of unwarranted and unfair fees against California consumers, and premature default resulting in unfair and illegal foreclosure proceedings. The scheme implemented by Defendants were designed to defraud not just Plaintiff but all California consumers and enrich the Defendants.

62. The foregoing acts and practices have caused substantial harm to not only Plaintiff but to all its California consumers and to all California taxpayers.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs pray for judgment against Defendants, as follows:

34

FIRST AMENDED COMPLAINT

1. For compensatory, special, and general damages in an amount according to proof at trial, but not less than $1,500,000.00 against all Defendants;

2. For punitive and exemplary damages in an amount to be determined by the Court against Defendants;

3. For an order compelling Defendants to remove any instrument which does or could be construed as constituting a cloud upon Plaintiff's title to the Property;

4. For a declaratory judgment finding that Defendants do not have any legally cognizable rights as to Plaintiff, the Property, Plaintiff's alleged debt, tendered to and executed by Plaintiff;

5. For the Court to issue an order restraining Defendants, their agents, or employees from continuing or initiating any action against the Property and enjoining Defendants, their agents, or employees from doing so during the pendency of this matter;

6. For reasonable cost of suit incurred in this action; and

7. For reasonable attorney's fees; and

8. For such additional and further relief as the Court may deem proper and reasonable.


DATED:  February 23, 2018

Respectfully submitted by:

_____
Ardreda Johnson
Plaintiff

35

FIRST AMENDED COMPLAINT

## VERIFICATION

I, Ardreda Johnson, an individual, am the Plaintiff in the above-entitled action. I have read the foregoing complaint and know the contents thereof. The same is true of my own knowledge, except as to those matters which are therein stated on information and belief, and as to those matters, I believe it to be true.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed in Rancho Cucamonga, California on February 23, 2018

_____
Ardreda Johnson
Plaintiff

36

FIRST AMENDED COMPLAINT

INVESTORS TITLE COMPA

RECORDING REQUESTED BY

**FIRST NLC FINANCIAL SERVICES, I**

AND WHEN RECORDED MAIL TO

**FIRST NLC FINANCIAL SERVICES, LLC
700 W. HILLSBORO BLVD. B-1 #204
DEERFIELD BEACH, FLORIDA 33441**

Recorded in Official Recor...  ...unty of San Bernardino    **11/20/2006**



**LARnY WALKER**
Auditor/Controller — Recorder

**8:00 AM
BS**

**771 SoCal Document Processing Inc**

Doc#:    **2006 – 0788066**



| Titles: | 1 | Pages: | 21 |
|---|---|---|---|
| Fees | | | 68.00 |
| Taxes | | | 0.00 |
| Other | | | 0.00 |
| PAID | | | $68.00 |

/4/4/08/

0227-831-17

————[Space Above This Line For Recording Data]————

# DEED OF TRUST

MIN: **100195910003465096**

DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A)  "Security Instrument" means this document, which is dated **November 07, 2006**                    , together with all Riders to this document.

(B)  "Borrower" is **ARDREDA JOHNSON, AS A SINGLE WOMAN**

Borrower is the trustor under this Security Instrument.

(C)  "Lender" is **FIRST NLC FINANCIAL SERVICES, LLC**
Lender is a **LIMITED LIABILITY COMPANY**                                                        organized and existing under
the laws of **THE STATE OF FLORIDA**                                                    . Lender's address is
**700 W. HILLSBORO BLVD. B-1 #204, DEERFIELD BEACH, FLORIDA 33441**

(D)  "Trustee" is **JEFFREY M. HENSCHEL**
**700 W. HILLSBORO BLVD. B-1 #204, DEERFIELD BEACH, FL 33441**

(E)  "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the beneficiary under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

(F)  "Note" means the promissory note signed by Borrower and dated **November 07, 2006**                . The Note states that Borrower owes Lender **Three Hundred Eighty Eight Thousand Five Hundred and no/100**
                                        Dollars (U.S. $ **388,500.00**                ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than **December 01, 2036**                .

(G)  "Property" means the property that is described below under the heading "Transfer of Rights in the Property."

CALIFORNIA—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT                                        **Form 3005 1/01**

ITEM 9926L1 (0011)—MERS                                        *(Page 1 of 12 pages)*                         GREATLAND ■
                                                            To Order Call: 1-800-530-9393 ▢Fax: 616-791-1131

*37*

**(H) "Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

**(I) "Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| [X] Adjustable Rate Rider | [X] Condominium Rider | [ ] Second Home Rider |
| [ ] Balloon Rider | [ ] Planned Unit Development Rider | [X] Other(s) [specify] **Interest Only Rider** |
| [ ] 1-4 Family Rider | [ ] Biweekly Payment Rider | |

**(J) "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

**(K) "Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

**(L) "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(M) "Escrow Items"** means those items that are described in Section 3.

**(N) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(O) "Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

**(P) "Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

**(Q) "RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(R) "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

**CALIFORNIA**—Single Family—**Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**

ITEM 9926L2 (0011)—**MERS**

*(Page 2 of 12 pages)*

**Form 3005 1/01**
GREATLAND ■
To Order Call: 1-800-530-9393 □ Fax: 616-791-1131

TRANSFER OF RIGHTS IN THE PROPERTY

The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the **County**

[Type of Recording Jurisdiction]

of                **San Bernardino**                   :

[Name of Recording Jurisdiction]

**SEE ATTACHED LEGAL DESCRIPTION** as Exhibit "A"

which currently has the address of                    **7352 STONEHAVEN PLACE**

[Street]

**RANCHO CUCAMONGA**       , California        **91730**          ("Property Address"):

[City]                                  [Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1.    Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

CALIFORNIA—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT                    **Form 3005 1/01**

GREATLAND ■

ITEM 9926L3 (0011)—MERS                    *(Page 3 of 12 pages)*                    To Order Call: 1-800-530-9393 □Fax: 616-791-1131

*39*

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

    **2.**    **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

    If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

    Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

    **3.**    **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

    Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

    The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in

CALIFORNIA—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT         **Form 3005 1/01**

ITEM 9926L4 (0011)—MERS         (*Page 4 of 12 pages*)         GREATLAND ■
To Order Call: 1-800-530-9393 □Fax: 616-791-1131

writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4.    Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5.    Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6.    Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7.    Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8.    Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9.    Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this

CALIFORNIA—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT

ITEM 9926L6 (0011)—MERS                              *(Page 6 of 12 pages)*

Form 3005 1/01
GREATLAND ■
To Order Call: 1-800-530-9393 □ Fax: 616-791-1131

*42*

Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10.   **Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a)   **Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

(b)   **Any such agreements will not affect the rights Borrower has—if any—with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.**

11.   **Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period,

CALIFORNIA—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT                                                            Form 3005 1/01

*43*

Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this

CALIFORNIA—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT                                    Form 3005 1/01

                                                                                                    GREATLAND ■
ITEM 9926L8 (0011)—MERS                              (Page 8 of 12 pages)                To Order Call: 1-800-530-9393 □Fax: 616-791-1131

44

Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14.   Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15.   Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16.   Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17.   Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18.   Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19.   Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale

of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20.   Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21.   Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance

CALIFORNIA—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT                                    Form 3005 1/01

ITEM 9926L10 (0011)—MERS                              *(Page 10 of 12 pages)*                GREATLAND ■
To Order Call: 1-800-530-9393 □ Fax: 616-791-1131

446

affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.**

**If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.**

**Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.**

**23. Reconveyance.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law. If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

**24. Substitute Trustee.** Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

**25. Statement of Obligation Fee.** Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

CALIFORNIA—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3005 1/01
ITEM 9926L11 (0011)—MERS                    *(Page 11 of 12 pages)*          GREATLAND ■
To Order Call: 1-800-530-9393 □ Fax: 616-791-1131

447

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in pages 1 through 12 of this Security Instrument and in any Rider executed by Borrower and recorded with it.

_____ (Seal)            _____ (Seal)
**ARDREDA JOHNSON**              -Borrower                                    -Borrower

_____ (Seal)            _____ (Seal)
                                 -Borrower                                    -Borrower

_____ (Seal)            _____ (Seal)
                                 -Borrower                                    -Borrower

Witness:                                     Witness:

_____                    _____

State of California
County of ~~San Bernardino~~ *Los Angeles*                    )
                                                              )
On *November 7, 2006*          before me, *Lillian Gonzalez, Notary Public*
personally appeared **ARDREDA JOHNSON**

~~personally known to me~~ (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

Signature: _____

```
LILLIAN GONZALEZ
Commission # 1437036
Notary Public - California
Los Angeles County
My Comm. Expires Aug 30, 2007
```

CALIFORNIA—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT                    **Form 3005 1/01**
                                                                                      GREATLAND ■
ITEM 9926L12 (0011)—MERS                    *(Page 12 of 12 pages)*                    To Order Call: 1-800-530-9393 □ Fax: 616-791-1131

*48*

**Exhibit A**
**LEGAL DESCRIPTION**

All that certain real property in the County of SAN BERNARDINO, State of California, described as follows:

PARCEL 1:

LOT(S) 17 OF TRACT NO. 14407, IN THE CITY OF RANCHO CUCAMONGA, COUNTY OF SAN BERNARDINO, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 248 PAGE(S) 14 THROUGH 19 INCLUSIVE, FILED IN THE OFFICE OF THE COUNTY RECORDER OF SAN BERNARDINO COUNTY ON MAY 26, 1992;

EXCEPTING THEREFROM NON-EXCLUSIVE EASEMENTS FOR ACCESS, INGRESS, EGRESS, MAINTENANCE, DRAINAGE, REPAIR, ENCROACHMENT, SUPPORT, AND FOR OTHER PURPOSES, ALL AS DESCRIBED IN THE DECLARATION OF RESTRICTIONS OF NORTHVIEW PLANNED DEVELOPMENT, RECORDED ON AUGUST 12, 1992, AS INSTRUMENT NO. 92-334969 IN THE OFFICIAL RECORDS OF SAID COUNTY AND ALL AMENDMENTS, MODIFICATIONS, OR SUPPLEMENTS THERETO (HEREINAFTER THE "DECLARATION").

EXCEPT THEREFROM ALL OIL, GAS, MINERALS AND OTHER HYDROCARBON SUBSTANCES, LYING BELOW A DEPTH OF 500 FEET, WITHOUT THE RIGHT OF SURFACE ENTRY, AS GRANTED TO WESTERN SUPPLY CORP. BY DEED RECORDED SEPTEMBER 17, 1979, IN BOOK 9772, PAGE 1262, OFFICIAL RECORDS.

EXCEPTING THEREFROM ALL MINERALS, OIL, GAS, PETROLEUM, OTHER HYDROCARBON SUBSTANCES AND ALL UNDERGROUND WATER IN OR UNDER OR WHICH MAY BE PRODUCED FROM SAID LAND WHICH UNDERLIES A PLANE PARALLEL TO AND 500 FEET FROM THE PRESENT SURFACE OF SAID LAND FOR THE PURPOSE OF PROSPECTING FOR, THE EXPLORATION, DEVELOPMENT, PRODUCTION, EXTRACTION AND TAKING OF SAID MINERALS, OIL, GAS, PETROLEUM. OTHER HYDROCARBON SUBSTANCES AND WATER FROM SAID LAND BY MEANS OF MINES, WELLS, DERRICKS, OTHER EQUIPMENT FROM SURFACE LOCATIONS ON ADJOINING OR NEIGHBORING LAND OR LYING OUTSIDE OF THE ABOVE DESCRIBED LAND, IT BEING UNDERSTOOD THAT THE OWNER OF SUCH MINERALS, OIL, GAS, PETROLEUM, OTHER HYDROCARBON SUBSTANCES AND WATER AS SET FORTH ABOVE, SHALL HAVE NO RIGHT TO ENTER UPON THE SAID LAND OR ANY PORTION THEREOF ABOVE SAID PLANE PARALLEL TO AND 500 FEET BELOW THE PRESENT SURFACE OF THE SAID LAND FOR ANY PURPOSE WHATSOEVER.

PARCEL NO. 2:

NON-EXCLUSIVE EASEMENTS FOR ACCESS, INGRESS, EGRESS, ENCROACHMENT, DRAINAGE, REPAIR, MAINTENANCE, SUPPORT, AND FOR OTHER PURPOSES, ALL AS DESCRIBED IN THE DECLARATION.

49

PARCEL NO. 3:

NON-EXCLUSIVE EASEMENT ON AND OVER THE "COMMON AREA", AS DEFINED IN THE
DECLARATION OR ACCESS, USE, OCCUPANCY, ENJOYMENT, INGRESS TO, AND EGRESS
FROM THE AMENITIES LOCATED THEREON, SUBJECT TO THE TERMS AND PROVISIONS
OF THE DECLARATION. THIS EASEMENT IS APPURTENANT TO PARCEL 1 ABOVE
DESCRIBED. THE COMMON AREA IS FOR THE USE OWNERS OF LOTS WHICH ARE
SUBJECT TO THE DECLARATION AND IS NOT FOR THE USE OF THE GENERAL PUBLIC.


APN No:   0227-831-17-0-000

# ADJUSTABLE RATE RIDER

**(LIBOR Six-Month Index (As Published In *The Wall Street Journal*)—Rate Caps)**

THIS ADJUSTABLE RATE RIDER is made this **7th** day of **November 2006** , and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned ("Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to

**FIRST NLC FINANCIAL SERVICES, LLC**

("Lender") of the same date and covering the property described in the Security Instrument and located at:
**7352 STONEHAVEN PLACE
RANCHO CUCAMONGA, CA 91730**

[Property Address]

**THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE INTEREST RATE AND THE MONTHLY PAYMENT. THE NOTE LIMITS THE AMOUNT BORROWER'S INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE BORROWER MUST PAY.**

**ADDITIONAL COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

**A.   INTEREST RATE AND MONTHLY PAYMENT CHANGES**

The Note provides for an initial interest rate of        **7.0000%**. The Note provides for changes in the interest rate and the monthly payments, as follows:

**4.   INTEREST RATE AND MONTHLY PAYMENT CHANGES**

**(A)   Change Dates**

The interest rate I will pay may change on the first day of **December 2008** , and on that day every sixth month thereafter. Each date on which my interest rate could change is called a "Change Date."

**(B)   The Index**

Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average of interbank offered rates for six month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in *The Wall Street Journal*. The most recent Index figure available as of the first business day of the month immediately preceding the month in which the Change Date occurs is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(C)   Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding
**Six and One Quarter**
percentage points (        **6.250%**) to the Current Index. Subject to the limits stated in Section 4(D) below, this amount will be my new interest rate until the next Change Date.

MULTISTATE ADJUSTABLE RATE RIDER—LIBOR SIX-MONTH INDEX (AS PUBLISHED IN *THE WALL STREET JOURNAL*)—Single Family

*(Page 1 of 3 pages)*

5243611342
10019591000345096

FNLC Form 33029L1  (04052005)

51

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D)  Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than **10.0000%** or less than **7.0000%**. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than **One and One Half** percentage points (**1.5000%**) from the rate of interest I have been paying for the preceding six months. My interest rate will never be greater than **14.0000%** or less than **7.0000%**.

**(E)  Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F)  Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given me to and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**B.   TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**

Uniform Covenant 18 of the Security Instrument is amended to read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

*(Page 2 of 3 pages)*

**100195910003465096**                                     FNLC Form 33029L2  (04052005)

52